Robert Leslie **WILKES** et al., Petitioners,

v.

Margaret Alice **WILKES**, Respondent.

No. B–3217.

Supreme Court of Texas.

Nov. 22, 1972.

Rehearing Denied Dec. 27, 1972.

Marks & Black, James K. Peden, III and Don Black, Strasburger, Price, Kelton, Martin & Unis, Royal H. Brin, Jr., Dallas, for petitioners.

Hultgren, Jewell & Kolb, James J. Hultgren, Dallas, for respondent.

GREENHILL, Chief Justice.

This case involves the construction of the will of Belle Shumard. Her will created a trust which still exists. The questions are the intention of the testatrix as to the ultimate distribution of the property and of the trust income in the meantime. These questions, in turn, depend upon whether Belle intended to make a gift to a class or group which was capable of future change in number. Her will provides for a devise to "the lineal descendants, if any," of various beneficiaries including those of her adopted daughter, Virginia Wilkes. At the time of Virginia's death, she had only one lineal descendant, her son, Robert S. Wilkes. Subsequently, Robert S. Wilkes had two sons, both living, Robert L. Wilkes and Gerald Wilkes. The plaintiff herein is Margaret Wilkes, wife of Robert S. Wilkes and the stepmother of Robert L. and Gerald Wilkes. The trial court held that the sons of Robert S. Wilkes are lineal descendants of Virginia Wilkes and that Belle intended a gift to the class of "lineal descendants" which includes them. The court of civil appeals disagreed. It held that when Virginia, the mother of Robert S., died, an estate vested in Robert S. Wilkes; and hence he could convey an interest in the estate to his wife Margaret (not a lineal descendant) and could cut off, or limit, the interests of his own sons, the grandchildren of Virginia Wilkes. 474 S.W.2d 777.

We agree with the construction made by the trial court; and accordingly, we reverse the judgment of the court of civil appeals. Our holding is that Belle Shumard intended a gift to the class of "lineal descendants," a group capable of future changes in number, rather than a bequest to specific individuals.

The will of Belle Shumard is quite long. Its general scheme was to divide her trust property and its income into three lines. To assist in the understanding of the will, we set out a diagram of the relevant people involved. This litigation involves only the third line.

```
                    Belle Shumard
                         |
        (Executed her will in 1922, died in 1923)
                         |
      _____|_____
     |                   |                           |
son, Malnor      3 granddaughters          adopted daughter
(died intes-                               Virginia Wilkes (died
  tate 1927)     1) Isabel Griffith             intestate 1960)
                    (deceased)                       |
                 2) Carrie Maxwell,                 son
                    alive                  Robert S. Wilkes (married to
                 3) Salina Hulings,             Margaret Wilkes, plaintiff
                    alive                        here.  He died testate in
                                                1969.)
                                                     |
                                                    sons
                                           Robert L. Wilkes
                                           Gerald M. Wilkes
                                           (defendants here)
```

[A69883]

As relevant here, Belle Shumard's will had the following provisions. Matters in brackets and all emphasis are added by us.

"First: I hereby appoint Dallas Trust & Savings Bank [now merged with defendant First National Bank of Dallas] Executor and Trustee hereunder.

"Fifth: I will, devise and bequeath unto my Executor and Trustee my Main Street, Dallas, Texas, property, * * * *in trust* for beneficiaries hereinafter named, for and during the life of my said son Malnor A., my three above named granddaughters [Isabel Griffith, Salina Hulings and Carrie Maxwell], and my said adopted daughter [Virginia Wilkes], *and until the death of the last survivor of them,*—and during the period of the trust the trustee shall have full power and possession, control and management of this property * * * *and the net revenues thereby derived shall be distributed among the beneficiaries as hereinafter provided.*

"Sixth: * * * of the net revenues of the trust property * * * I will, devise and bequeath to my beloved son, Malnor A. Shumard, one-third thereof for and during his natural life; but at his death, * * * [Malnor left no will. Belle's will provided that if he should not leave a will, then "otherwise to his lineal descendents, if any."]

"And one-third of said net revenues shall be paid in equal proportions to my above named Granddaughters—the sole heirs of my deceased daughter, Carrie Shumard Carden, share and share alike, during their respective lives; but at their respective deaths * * *. [Belle also provided that the revenues could be devised by the granddaughters, "otherwise to her [their] lineal descendants, if any."]

"And the other or remaining one-third of said net revenues of the trust property shall be paid to my said adopted daughter [Virginia Wilkes] for and during her natural life, and at her death then to the beneficiaries of her will if she shall have left a valid will which shall be duly probated,—*otherwise to her lineal descendants, if any*. But if she shall thus die intestate and without leaving lineal descendants, then her portion shall revert to my estate and be distributed among the surviving beneficiaries of this my will as herein provided.

"Seventh: *At the termination of the trust* here created then it is my will, and I so direct that the trust property and all proceeds thereof in possession of the Trustee * * * *shall be partitioned and divided among the then surviving beneficiaries of this my will, as follows:*

"One-third to the beneficiaries of the will of my said son, Malnor, * * *.

"One-third, share and share alike, to the respective beneficiaries of the respective wills of my said granddaughters * * * ["otherwise to the lineal descendants, if any, of the intestate decedent."]

"*The remaining one-third* to the beneficiaries of the will of my said adopted daughter if she shall have left a valid will which shall be duly probated, *otherwise to her lineal descendants, if any; but if she shall have died intestate and without leaving any lineal descendants, then her portion shall revert to my estate and be distributed among the surviving beneficiaries of this my will, share and share alike.*"

The will was probated, and the bank continues to serve as trustee. The trust has not terminated. Salina and Carrie, two of the five named life tenants, are alive and are parties to this suit.

Virginia Wilkes, the adopted daughter, died intestate in 1960. She had one son, Robert S. Wilkes. After the death of Virginia in 1960, Robert had two sons, Robert L. and Gerald. As stated, Margaret A. Wilkes, the plaintiff herein, was married to Robert S. Wilkes and is the stepmother of Robert L. and Gerald Wilkes.

The controversy arose because Virginia's son, Robert S. Wilkes, left a will in which he attempted to name his wife a beneficiary of an interest in the corpus of the trust created by Belle Shumard's will and in the income of the trust. The wife of Robert S. Wilkes (Margaret), of course, is not a "lineal descendant" of Virginia Wilkes. If the gift under the will is to the class of "lineal descendants," then it was not within the power of Robert S. Wilkes to devise the property of the Belle Shumard trust, or the income from it, to his wife; and the property would go to "the lineal descendants," the sons of Robert S. Wilkes.

The suit was brought by Margaret Wilkes for a construction of the will. She seeks to sustain the one-sixth interest willed to her by her husband. Her contention is that since Robert S. Wilkes was the sole "lineal descendant" when his mother Virginia died, this portion of the property and its trust income *vested* in him; and hence he could dispose of it by his will. The court of civil appeals, in agreeing with that construction, applied the rule favoring early vesting of estates. That rule is recognized, particularly where the alternative is to void the trust or grant. Rekdahl v. Long, 417 S.W.2d 387 (Tex.1967); Pickering v. Miles, 477 S.W.2d 267 (Tex.1972). The rule, however, is not applicable where, as here, there are other expressed indicia of intent.

We do not regard the will as being ambiguous. We must seek the intent of the testatrix; and having done so, we must give effect to it. As Chief Justice Marshall observed in Smith v. Bell, 6 Pet. (31 U.S.) 68 L.Ed. 322 (1832), such intent is the polar star to be used by the courts in the construction of a will.

The testamentary scheme is this:

1. Belle devised a large part of her realty in trust for the lives of Malnor, Isabel, Salina, Carrie and Virginia, describing their several relationships to her.

2. Then she provided for distribution of the net revenues (income) among "the beneficiaries," giving (a) Malnor one-third for life, (b) Isabel, Salina, and Carrie one-third to be divided equally between them during their respective lives, and (c) Virginia one-third for life. In each instance at the death of the life beneficiary, the net revenues (income) were directed to be paid to the beneficiaries of a valid will of the life beneficiary, in legal effect a testamentary power to appoint persons to receive the trust revenues. If no valid will was probated, the trust revenues were to be distributed to the beneficiary's "lineal descendants, if any." In the absence of lineal descendants, the trust revenues were to be paid to the other "beneficiaries" under the will.

3. The trust was to last "until the death of the last survivor" of the five named life tenants. "At the termination of the trust * * * the trust property shall be divided among the then surviving beneficiaries of this my will as follows,"—one-third to the beneficiaries of Malnor's will, one-third divided between the beneficiaries of the wills of Isabel, Salina, and Carrie, and one-third to the will beneficiaries of Virginia. If Virginia left no will, the last one-third was to go "to her lineal descendants, if any." The testatrix used the same sort of language as the above in disposing of the income from the trust. If Virginia died intestate and without lineal descendants (which did not happen), the share would be distributed "among the surviving beneficiaries of this my will."

It is significant that distribution at the trust termination is to be among the "then surviving beneficiaries of this my will," and that distribution in the absence of a valid will or lineal descendants is also "among the surviving beneficiaries of this my will." This repeats similar language covering distribution of net revenues at the earlier deaths of the respective life tenants during the term of the trust.

The testatrix looked constantly at a group, a class of surviving persons uniden-

tifiable at the time of the execution of her will and at her death but to be chosen from, and to become identifiable at, the dates of interim and final distribution. Her use of language is completely consistent in this respect.

Belle's will did not name Robert S. Wilkes as a beneficiary. His rights under the will depended upon his qualification as a "lineal descendant" of Virginia surviving at her death. He did so qualify and began receiving distributions of "net revenues." At the time, he was the only lineal descendant of Virginia; so he received the net revenues from her entire one-third. His right to receive that income would have continued so long as he occupied that status. It was not subject to division with any other person because his mother, Virginia, had made no different provision by will; and there were no other lineal descendants to share in any division.

■■ Upon the birth of a son to Robert S., another legal descendant entered the picture, but that descendant's rights to a distribution of net revenues was subordinate to that of his living father upon principles of per stirpes distribution. In this limited sense, Robert S. Wilkes' right to this income was vested. But his interest as a lineal descendant in the income was subject to failure at the date of any distribution of net revenues if he was not there to receive it; for if there was no other person who could then qualify as a lineal descendant of Virginia, the will of Belle provided that the income would be distributed "among the surviving beneficiaries of this my will." In the facts before us, the sons of Robert S. Wilkes, Gerald and Robert L., at their father's death, could qualify as lineal descendants of Virginia; but his wife, Margaret, could not possibly do so because she did not fall within the class of "lineal descendants" of Virginia. Nothing that Robert could do by will could alter this fact. The will is unequivocal: "said net revenues shall be paid to * * * her [my adopted daughter Virginia's] lineal descendants." It does not say "to those

persons whom Virginia's lineal descendants ·shall appoint by will." Robert S., a lineal descendant of Virginia, tried to appoint his wife. Belle's will gave him no authority to do so.

It is equally clear that those persons who are to share in Virginia's one-third of the trust principal at the death of the last surviving life tenant are, or will be, Virginia's "then surviving lineal descendants, if any." Though there are now living persons (Robert S.'s sons) who are potential beneficiaries of this segment of the corpus of the trust, it cannot now (the last surviving life tenant not having died) be known whether either of them will ultimately receive any portion of that principal. One thing is sure. Margaret is not Virginia's lineal descendant; and hence, no matter when the trust termination occurs, she cannot qualify to share in it.

The factors that lead to the foregoing conclusions as to the meaning of the language employed by Belle Shumard are these:

1. The particular use of the word "beneficiaries" to refer to the five named life tenants.

2. The requirement that the "net revenues shall be paid * * * to her lineal descendants," language which in this context can only mean that a separate determination must be made as each revenue payment is about to be disbursed.

3. The precise termination date of the trust as drawn from the combined reading of paragraph "Fifth: I will my property in trust until the death of the last survivor of them" and Paragraph "Seventh: At the termination of the trust here created * * * the trust property * * * and * * * any *then existing lease* * * * shall be partitioned and divided among *the then* surviving beneficiaries of this my will, as follows * * *"

4. Who those "then surviving beneficiaries" will be is immediately defined. Virginia's one-third goes (she having

failed to appoint by will) "to her lineal descendants, if any."

Preoccupation with the characterization of the nature of the interest which Robert S. Wilkes had during his lifetime under Belle Shumard's will as "vested" or "contingent" seems to have confused the issue in the court of civil appeals. He had the right to receive income as long as he met the qualifications of the bequest. He was alive and, for a time, the sole lineal descendant of Virginia and entitled to her one-third.

The gift to "lineal descendants" is a gift to a class within the rule of Hagood v. Hagood, 186 S.W. 220 (Tex.Civ.App.1916, writ refused), where it was correctly said,
"  * * *  appellees have presented in concrete form substantially correct definitions of the terms 'class,' and 'gifts to a class,' that we think fairly reflect the state of the authorities on the subject, viz.:

(6) "A 'class,' as used in the law of wills, is where several persons answering the same description sustain the same relation to the legacy so that one word describes them all; each takes an equal share in the property, and each takes originally, and not by way of substitution or derivatively, and each takes absolutely. A number of persons are said to form a 'class' when they can be designated by the same general name as 'children,' 'grandchildren,' 'nephews,' 'brothers,' or 'sisters.' The gift must be an aggregate sum to a body of persons uncertain in number at the time of the gift.

(7) "Gifts to a 'class,' as that term is used and understood in the construction of wills, refers to persons in the aggregate bearing a certain relationship to the testator or to each other; and a devise to one or two members of that class will not constitute such favored members a class in legal contemplation, unless a testator, by the terms of his will, expressly declares that such individuals so selected from a class are to enjoy the rights of survivorship in case of the death of one of them, and unless the will so provides the legacy so given to one of such members will lapse on his death before the testator." 186 S.W. at 225.

Accord, Farrell v. Cogley, 146 S.W. 315 (Tex.Civ.App.1912, writ refused); Welch v. Trustees of Robert A. Welch Foundation, 465 S.W.2d 195 at 200 (Tex.Civ.App.1971, writ refused, n. r. e.); Johnston v. Johnston, 276 S.W. 776 (Tex.Civ.App.1925, no writ).

The Restatement of Property, Volume 3, is helpful. The introduction to its chapter on class gifts states at page 1445,

"Conveyances frequently describe the intended conveyees thereunder by some group designation such as 'children,' 'grandchildren,' 'brothers,' 'sisters,' 'nephews,' 'nieces,' 'cousins,' 'issue,' 'descendants' or 'family.' The effects of any such conveyance depend upon whether the conveyor is found to have intended his conveyees to be specified persons taking singly or to be the members of a group capable of a future change in number, and taking as a group. If the latter construction is made, the conveyees constitute a 'class' and the conveyance contains a 'class gift.' "

Section 279 reads: "Class Gifts—Prerequisite Group-Mindedness of the Conveyor.

"A conveyance of property which designates the conveyees, or part of them, as 'children,' 'grandchildren,' 'brothers,' 'sisters,' 'nephews,' 'nieces,' 'cousins,' 'issue,' 'descendants' or 'family' limits a class gift if, but only if, it is found that the conveyor intended to designate as his conveyees a group capable of a future change in number, rather than specific individuals."

Comment:

"a. Rationale. The intention of the conveyor that there be the possibility

of fluctuation in the number of takers is the factor which differentiates a class gift from a gift to individuals singly."

"d. Time from which capacity to fluctuate is judged. In determining whether the group is 'capable of a future change in number' the possibilities of the future are viewed from the time of the delivery of an inter vivos conveyance and from the time of the execution of a will. Thus in the case of a will the possibility of fluctuation must be determined not only with respect to the time subsequent to the time when such conveyance becomes effective by the death of the testator, but also with respect to the time prior to such death but after the execution of the instrument."

Another definition of class gifts is found in Evans v. Safe Deposit & Trust Co., 190 Md. 332, 58 A.2d 649 (1948):

"A gift to a class has been defined as a gift of an aggregate sum (1) to a body of persons uncertain in number at the time of the gift, (2) to be ascertained at a future time, and (3) who are all to take in equal or some other definite proportions; the share of each being dependent for its amount upon the ultimate number of persons." 58 A.2d at 652.

Referring to Rule 279 of the Restatement of Property set out above, the court continued,

"The 'antithesis' of a class gift 'is a gift to an individual either by name or by some description sufficiently explicit to permit the donee to be identified as the particular individual for whom the gift was intended'." 58 A.2d at 653.

In Sanderson v. First National Bank in Dallas, 446 S.W.2d 720 (Tex.Civ.App.1969, writ ref., n. r. e.), the testatrix had four sisters and a brother when she executed her will. She provided, as relevant here, that her property should "be equally divided between my sisters." At the time of the death of the testatrix, her brother and three of her sisters had died. One sister survived. If the bequest was to four individuals, then the bequest of the three of the sisters lapsed; and other members of the family favored this construction. If the gift was to the class, then the property went to the surviving sister. Citing Section 279 of the Restatement, supra, the court held that there was a gift to the class:

"As we understand the law of wills a gift to a class is a devise or bequest of property to a group of persons, the membership of which is not ascertainable until some time after the date of the execution of the will unless the will plainly provides otherwise. It has been said (and we believe it is the rule in nearly all jurisdictions) that ' * * * the essential feature of a class gift is that the number of the persons who are to take the fund or property is to be ascertained at a future time—future, that is, as of the date of the instrument making the disposition. In the case of a will it is everywhere recognized that the time of the testator's death may, and ordinarily it does, serve as such future time, notwithstanding by the modern law a will does not take effect * * * until such death, and the date of the will is therefore not the date of the gift.' " 446 S.W. 2d at 723.

Here, by describing the alternate takers of the net revenues as "lineal descendants," Belle looked to a future group of persons she did not know and could not name. As stated, she did not name Robert S. Wilkes and thus restrict the gift over in default of Virginia's appointment to him. Instead, she designated a class of "lineal descendants" into which Robert happened to fit at Virginia's death. He, therefore, received the income as long as he qualified for it.

But he was given no power to dispose of that income interest. He could only dispose of the payments as he received them. Before Virginia died, it could not be known that he himself would be the lineal descendant who would be entitled to her income interest and also be the only one. His contingency ripened into a "vested" interest

so long as he lived and continued to qualify. But that income interest would disappear if he failed to qualify at any distribution.

Pending the ultimate termination of the trust, his interest in the income was similar to that involved in Morrison v. Morrison's Executor, 14 N.J.Eq. 330 (1862) in which the will in question left income to grandsons until they respectively reached 21. The court wrote,

> "The only question is, in what shares or proportions are they to receive it, and how is their respective interest to be ascertained. The testator obviously designed that it should be used for their maintenance and education. There is no provision for accumulation, but an express direction, that until they respectively arrive at twenty-one years of age, the trustees shall give them the benefit of the income. The benefit must enure to such of the children as are in being. They may die before they are twenty-one. Other children may hereafter be born, and become entitled to a share of the legacy and of the accruing income. Should these contingencies happen, corresponding changes will be made in the apportionment of the income to conform to the interests of the several legatees. But until such contingencies do happen, the children now *in esse* will be entitled to receive the income of the fund." 14 N.J.Eq. at 331.

The situation was similarly described in Ford v. Jones, 223 Ky. 327, 3 S.W.2d 781 (1928):

> "No one can know, until these two life tenants are dead, just who will compose the benefited class. Until that time comes, the interest of these remaindermen in this property is merely a contingent interest.
>
> \*  \*  \*  \*  \*  \*
>
> "Where, under the provisions of a will, a gift to a class is postponed until after the termination of a preceding estate, as a rule, those members of the class, and those only, take who are in existence when such preceding estate terminates, and the time for distribution comes. The number of pieces into which the pie shall be cut and the parties to whom they shall be passed is determined by those of the class present when the time for cutting comes." 3 S.W.2d at 785–786.

The current *income* pie here, like *remainder* pie, must be divided as each distribution is made.

In In re Anderson's Estate, 165 Pa.Super. 353, 67 A.2d 783 (1949), the will provided a trust until the death of the children and until the youngest grandson became 21. It then provided,

> "If any of my said children should not survive me, and die leaving no child or children to survive him or her, then the share of such deceased child shall be divided equally among my surviving children; if a child or children survive the parent, the parent's share shall vest in my Trustees, hereinafter named." 67 A.2d at 784.

One of the children died without descendants but leaving a wife to whom he had delivered an inter vivos assignment of his share of the trust income. The trust, as here, was still in operation since the time for termination had not yet arrived. The court held,

> "From a reading of the whole will we are of opinion that it was clearly the intent of the testator to create a definite trust for the purpose  \*  \*  \*  of providing an income for life for his children and for his grandchildren, and upon the death of the last surviving child and the arrival of the youngest grandchild at the age of twenty-one years, the trust was to terminate and the corpus was to be distributed per stirpes to the grandchildren. Since appellant's husband had only a life estate in the trust income, he could not make a valid assignment beyond his lifetime." 67 A.2d at 785.

A case having facts rather close to those before us is Burlington County Trust Co. v. Di Castelcicala, 2 N.J. 214, 66 A.2d 164 (1949). In that case, the class was "grandchildren" rather than "lineal descendants." The New Jersey Supreme Court reached a result which we reach here and with similar reasoning. There, as here, one of the life tenants attempted to devise an interest in the income of a testamentary trust to his wife. The court concluded that,

"* * * the testatrix meant the gift for life after the life estate of her daughters to go to her grandchildren as a class flowing from either daughter, comprehensive of after-born grandchildren if there should prove to be such; the gift as to any grandchild to terminate necessarily at his death because the gift was merely of a life estate." 66 A.2d at 166.

The holding was that the devise to the wife was ineffective because it came from her husband "whose interest terminated at his death."

This result also finds support in the Restatement of Property, where it says in Volume 3 at page 1588 and following:

"A limitation in favor of a class frequently directs the periodic distribution of income to such class. Limitations containing such a provision are of three distinct types.

"In one of these types, the limitation directs that the corpus be distributed at a future date to the described group and accompanies this direction by the further provision that the income earned prior to such distribution of the corpus shall be periodically distributed among the members of the described group available on each such day of income distribution. This first type of limitation presents no new problems as to 'postponed gifts' arising out of the inclusion of the directions as to income. The class continues to be able to increase until the time arrives for the distribution of corpus, and each intervening distribution of income must take into account those increases in membership which occur prior thereto and no others."

*  *  *  *  *  *

"Under a limitation of income in favor of a class, the possession of the thing producing the income is in some person other than the class members. Usually such possession is in a trustee. Hence there is no difficulty in distributing the income which becomes available periodically, to a group which varies in personnel from period to period. If, however, a legal life interest or other legal interest of restricted duration is given to the class, the persons to whom the possession is to be given must be ascertained before possession is delivered and it is not convenient to have possessory interests so created subject to subsequent shifts as new 'possible takers' are born into the class. Herein lies the difference which permits the members of a class to continue to increase in number longer when the subject matter of such gift is income than when the subject matter thereof is a possessory interest."

What has been said with respect to the income interest under Belle Shumard's will likewise disposes of Margaret Wilkes' claim to share in the distribution of the trust principal at the death of the last survivor of the life tenants, Carrie Maxwell and Salina Hulings, and for the same reasons set out above. Margaret is not a lineal descendant of Virginia Wilkes and hence can never be a member of the class designated by Belle to take if Virginia did not exercise her testamentary power of appointment. Belle gave Robert S. Wilkes no such power, and his will can give no trust principal to Margaret.

We do not decide, indeed we cannot now decide, who will be entitled to Virginia Wilkes' share of the trust principal at the termination of the trust upon the death of the last surviving life tenant. All that can now be said is that the group can not include Margaret Wilkes because Belle's

will leaves out a person in Margaret's position.

The court of civil appeals, therefore, erred in construing Belle's will to create a vested remainder and hence a transmittable interest in Robert S. Wilkes. His interest was contingent upon his continued survival both as to income and as to a share of the principal.

Accordingly, the judgment of the court of civil appeals is reversed, and the judgment of the trial court is affirmed.